**22-mj-7041-JCB**
**22-mj-7042-JCB**
**22-mj-7043-JCB**
**22-mj-7044-JCB**

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Special Agent Jason Taylor, being sworn, state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I was appointed to the FBI in May 2019. As such, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2.      I am currently assigned as a Special Agent to the FBI Metro Boston Gang Task Force ("MBGTF"). My duties include working as a liaison between federal, state, and local law enforcement entities in the investigation of illegal distribution of narcotics, firearm offenses, and associated gang-related violent crimes. In the course of participating in investigations of drug distribution/trafficking, I have conducted or participated in surveillance, the purchase of illegal drugs and firearms, the execution of search warrants, debriefings of subjects, witnesses, and informants and reviews of consensually recorded conversations and meetings.  Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply.  I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3.      Prior to my current assignment, I was assigned to the FBI Miami Field Office where I conducted investigations in Transnational Organized Crime Western Hemisphere, prior to the assignment in Miami I was a United States Army Infantry Officer where I conducted Counter Terrorism and Counterinsurgency Operations.

4.      Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 U.S.C. § 841(a)(1), for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## PURPOSE OF THIS AFFIDAVIT

5.      I am currently investigating Csean SKERRITT  ("SKERRITT"), a/k/a "SHIZZ GRIMMY," a/k/a "BLACK," born 1988, and others yet unknown for violations of federal law, including Title 21, United States Code, Section 841(a)(1) (distribution of controlled substances) (the "TARGET OFFENSE").

6.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for historical cell-site location information and precise location information about the mobile phones assigned;

    a.  774-464-1682 (the "TARGET PHONE - 1"), the subscriber to which is "Csean SKERRITT," at a listed address in Boston, MA, and that is believed to be utilized by SKERRITT.  The service provider for this phone is T-Mobile ("T-Mobile"), a wireless telephone service provider that accepts service of process at T-Mobile Security Assistance Team, T-Mobile 4 Sylvan Way Parsippany, NJ 07054.  The TARGET PHONE is further described in Attachment A, and the location information to be seized is further described in Attachment B.

    b.  857-588-3057 (the "TARGET PHONE - 3"), the subscriber to which is "Csean SKERRITT," at a listed address in Boston, MA, and that is believed to be utilized by SKERRITT.  The service provider for this phone is T-Mobile ("T-Mobile"), a wireless telephone service provider that accepts service of process at T-Mobile Security Assistance Team, T-

Mobile 4 Sylvan Way Parsippany, NJ 07054.  The TARGET PHONE is further described in Attachment A, and the location information to be seized is further described in Attachment B.

7.       Based on the facts set forth in this affidavit, there is probable cause to believe that SKERRITT and others have violated 21 U.S.C. § 841(a)(1) (distribution of controlled substances). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them. As set forth below in further detail, investigators believe that evidence, fruits, and instrumentalities of the crimes listed above are likely to be found with this location information of the TARGET PHONES described in Attachment A.

8.       The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

## I.       Background

9.       The Federal Bureau of Investigation ("FBI") and the Boston Police Department ("BPD") are investigating SKERRITT, who I believe is an associate of the Morse Street gang in Boston. SKERRITT is selling fentanyl in the Boston area, since at least December, 2022.  Under the FBI's direction, an FBI cooperating witness ("CW-1") [1] made several controlled buys of narcotics from SKERRITT, which were audio and video recorded.

---

[2]  CW-1 has a criminal history that includes prior arrests for assault and battery with a dangerous weapon, breaking and entering, and distribution of Class A. On previous occasions, CW-1 has accurately identified, and corroborated events and individuals involved in active criminal investigations, including drug and firearm investigations. CW-1's information has led to previous search warrants, arrests, convictions, and seizures related to drugs and firearms. At the direction of law enforcement, the CW-1 has conducted controlled purchases of evidence in conjunction with criminal investigations.  CW-1's cooperation is financially motivated and CW-1 is being paid

3

10.     I am aware that SKERRITT is associated with the Morse Street gang in the Dorchester area of Boston, Massachusetts. The Morse Street gang is a criminal organization that conducts illegal activity including, but not limited to: drug dealing, armed robbery, crimes of violence, and illegal firearm possession/use. Morse Street gang members have several hangout locations and residential addresses in the Dorchester area; however members also travel throughout the Greater Boston area to conduct their illegal activity.

11.     I am also aware, based in part on records checks of the Massachusetts Board of Probation ("BOP") and Interstate Identification Index ("III"), that SKERRITT has numerous prior entries on his criminal history, including both arrests and convictions for trafficking cocaine, murder, possession of a firearm without a permit, subsequent offense, carrying a dangerous weapon, assault and battery on a public employee, disturbance in a correctional institution and escape.  Amongst SKERRITT's convictions are multiple charges for which the possible sentence would (and did) exceed one year.  Namely, in or about 2014, SKERRITT received a sentence of 5 years to 5 years and 1 day in state prison for possession of a firearm without a permit, subsequent offense, in the Suffolk Superior District Court on docket 1484cr10456.

12.     SKERRITT originally used the telephone number ending in -1682 (the "TARGET PHONE – 1") when communicating with CW-1.  Leading up to a controlled purchase of fentanyl on February 1, 2023, SKERRITT text messaged CW-1 from the phone number ending in -8962 (the "TARGET PHONE – 2") and informed CW-1 that he lost his phone and that his new number was a telephone number ending in -3057 (the "TARGET PHONE - 3").  SKERRITT

---

for his/her services and information provided.  Based on the corroboration, including recordings, I believe that CW-1's information is reliable.

used the TARGET PHONE – 3 when communicating with CW-1 on the day of the controlled purchase of fentanyl on February 1, 2023.

13.     Your affiant queried the TARGET PHONE - 1 through law enforcement databases and learned that the TARGET PHONE - 1's service provider is T-Mobile. Your affiant also learned that the listed subscriber for the TARGET PHONE 1 is "Csean SKERRITT" at a listed address in Boston, MA, that it was activated on or about September 21, 2021, and is believed to be used by SKERRITT.

14.     Your affiant queried TARGET PHONE - 2 through law enforcement databases and I have not been able to locate subscriber information.  I believe that TARGET PHONE – 2 is possibly a prepaid phone.  Based on my training and experience, the use of a prepaid phone, also known as a "burner" phone, is a common tactic of drug traffickers to elude identification by law enforcement and further one's conducting of unlawful activity.

15.     Your affiant queried the TARGET PHONE - 3 through law enforcement databases and learned that the TARGET PHONE - 3's service provider is T-Mobile. Your affiant also learned that the listed subscriber for the TARGET PHONE -3 is "Csean SKERRITT" at a listed address in Boston, MA, that it was activated on or about January 29, 2023, and is believed to be used by SKERRITT.

16.     For each of the controlled buys described below, law enforcement followed the following procedures: law enforcement officers first searched CW-I and his/her vehicle for money and contraband, with negative results.  Officers then provided to CW-I Official Agency Funds ("OAF") and a recording device and transmitter for use in the purchase. Officers then directed CW-1 to make a controlled purchase of drugs and conducted surveillance while CW-I drove to a prearranged location to meet SKERRITT, throughout the transaction, and as CW-1

drove back to a prearranged meet location to meet with officers.  There, officers retrieved the narcotics and recording and again searched CW-1 and his/her vehicle for contraband and money, with negative results.

## II.    Controlled Purchases from SKERRITT

17.    On January 25, 2023, CW-1 communicated with SKERRITT, who CW-1 knows by his nickname, "BLACK," through a series of phone calls, during which SKERRITT agreed to sell 5 "fingers," meaning 50 grams of fentanyl, for $1,500 to CW-1.  During these initial communications, they agreed to meet at 35 Pembroke Street in Chelsea, MA.

18.    During these communications with CW-1, SKERRITT used the telephone number 774-464-1682 ("TARGET PHONE - 1") for phone calls and text messages. One of these text messages from SKERRITT directed CW-1 to meet at 35 Pembroke Street.  Additional text messages between CW-1 and the TARGET PHONE – 1 confirmed the meeting time and location for the controlled purchase on that date.  Law enforcement officers involved in this investigation and CW-1 have become familiar with SKERRITT's voice and have recognized it on phone calls on both TARGET PHONE 1 and subsequently on TARGET PHONE 3.  Following the series of communications between SKERRITT and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with $1,500 and instructed CW-1 to meet with SKERRITT and make the drug purchase.  Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location at 35 Pembroke Street in Chelsea, MA, where CW-1 parked.

19.    At around the same time, additional law enforcement officers were conducting surveillance at pre-arranged meeting location at 35 Pembroke Street and observed SKERRITT,

who was wearing a face covering [2], arrive at 35 Pembroke Street in a 2019 black Infiniti SUV

with Massachusetts registration 3EKA91 [3] (the "TARGET VEHICLE - 1"), where he parked

TARGET VEHICLE – 1, exited the vehicle and entered CW-1's vehicle.

20.     This meeting location, 35 Pembroke Street, is approximately 200 feet away from

SKERRITT's residence, located at 21 Beacon Street, Chelsea, MA.  I am aware 21 Beacon

Street is SKERRITT' residential address based in part on my involvement in this investigation

and based on records checks.  While reviewing records, including from Door Dash, an online

food ordering and delivery platform, I have learned that SKERRIT provided 21 Beacon Street,

Chelsea, MA for his residence on his account.

21.     Agents, while monitoring the controlled purchase via physical surveillance and

the transmitter, observed the following: SKERRITT entered the front passenger seat of CW-1's

vehicle and engaged in a brief conversation with CW-1, during which SKERRITT and CW-1

conducted an exchange. After the exchange, SKERRITT walked directly from CW-1's vehicle

back to the TARGET VEHICLE – 1 and left the area, driving in the direction of Beacon Street.

CW-1 then also left the area.

22.     After CW-1 left the vicinity of TARGET LOCATION – 1, law enforcement

officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement

officers with a clear bag containing a white powdery substance.  Law enforcement officers then

searched CW-1 and his/her vehicle again, with negative results.  During the debriefing, CW-1

---

[2] During this controlled purchase, law enforcement officers observed SKERRITT wearing the face covering, a black facemask, along with a winter jacket with a fur-lined hood, a light-colored hooded sweatshirt, distressed (cut-up) jeans, and white athletic shoes.

[3] I am aware, based in part on records checks of the Massachusetts Registry of Motor Vehicles ("RMV"), that this vehicle is registered to SKERRITT.

told agents that CW-1 met with SKERRITT, where he/she purchased the suspected narcotics in exchange for the OAF.

23.     The clear bag contained approximately 54.6 grams of a white powdery substance that field-tested positive for the presumptive presence of fentanyl. Based on my training and experience, as well as that of other agents familiar with this investigation, the white powdery substance appeared to be fentanyl. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.

24.     On February 1, 2023, CW-1 communicated with SKERRITT through a series of phone calls and text messages, during which SKERRITT agreed to sell 5 additional "fingers," meaning 50 grams of fentanyl, for $1,500 to CW-1.  During these initial communications, they agreed to meet at 662 Columbia Road in Boston, MA (the "TARGET LOCATION – 1"). [4] Shortly thereafter, SKERRITT instructed CW-1 to meet at a different location in Boston, approximately 0.1 miles away from TARGET LOCATION – 1.

25.     As referenced above, leading up to a controlled purchase of fentanyl on February 1, 2023, SKERRITT text messaged CW-1 from the telephone number 857-383-8962 ("TARGET PHONE – 2") and informed CW-1 that he lost his phone and that his new number was telephone number 857-588-3057 (the "TARGET PHONE - 3").  After that, SKERRITT, using the

---

[4] I am aware that TARGET LOCATION – 1 belonged to Laelea Janiera Skerritt, because she is listed in the Boston City Assessing Department as the homeowner of 662 Columbia Road.  In addition, Laelea Skerritt's RMV record lists 662 Columbia Road in Boston, MA as her address. I previously believed that she was SKERRITT's mother (and, in fact, I swore out an affidavit earlier today, identifying her as SKERRITT's mother).  However, according to an online obituary, Lealea Skerritt unfortunately passed away in 2020, and was the sister of Alexander Skerritt.  See https://www.lopesfuneralhome.com/obituary/Laelea-Skerritt . According to SKERRITT's BOP, his father is Alexander Skerritt and SKERRITT's middle name is Alexander.  Additionally, according to SKERRITT's BOP, his mother is Mary and I no longer believe that SKERRITT's mother is Laelea. However, I do believe that SKERRITT has a connection to this location, through his family, although I don't currently know who legally owns TARGET LOCATION - 1 at this point.

TARGET PHONE – 3, continued to communicate with CW-1.  For example, on February 1, 2023, SKERRITT directed CW-1 to meet at the TARGET LOCATION - 1.  In subsequent text messages, SKERRITT asked CW-1 to meet at the KFC restaurant located at 695 Columbia Road and that SKERRITT was making another "play" and running late. I know, based on my training and experience, that a "play" is a slang term for making an illicit narcotics transaction. Shortly before SKERRITT met with CW-1, at approximately 12:13pm, he sent an additional text using TARGET PHONE – 3, stating that "I'm not going to be long, there is no traffic, just pulled up, I'm grabbing it." Based on my involvement in this investigation, I believe that "it" is a reference to the fentanyl that SKERRITT would subsequently sell CW-1 on February 1, 2023.

26.     Following the series of communications between SKERRITT and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with $1,500 and instructed CW-1 to meet with SKERRITT and make the drug purchase.  Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location in the vicinity of TARGET LOCATION – 1 in Boston, MA.

27.     While law enforcement officers surveilled CW-1 to the pre-arranged meeting location, additional law enforcement officers were conducting surveillance at the TARGET LOCATION – 1 in Boston, MA and at approximately 12:14pm [5], officers observed SKERRITT, who was wearing a face covering [6], arrive at the TARGET LOCATION – 1 in a gray Nissan Altima, with California registration 9BZH119 [7] (the "TARGET VEHICLE - 2").  Investigators,

---

[5] The FBI 302 report from this incident states this observation is at approximately "12:24pm," that is an error, the actual time of the observation is approximately 12:14pm.  In fact, this notation comes between observations made at 12:13pm and 12:21pm.

[6] During this controlled purchase, law enforcement officers observed SKERRITT wearing the face covering, a black facemask, along with a black leather jacket, black jeans, and white athletic sneakers.

[7] I am aware that this vehicle is registered to UMI ASSET LLC in San Francisco, California. I believe, based on my involvement in this investigation, that this vehicle is possibly a rental car.

including myself, are familiar with SKERRITT's appearance based on surveillance during the investigation, his RMV photo, and prior interactions with involved officers from BPD. SKERRITT used a key to unlock the door and enter that residence.  A few minutes later, SKERRITT exited the residence and drove the TARGET VEHICLE - 2 directly to the pre-arranged meeting location at the KFC restaurant located at 695 Columbia Road in Boston, MA, where he met with CW-1 at approximately 12:21 pm.

28.     Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: SKERRITT entered the front passenger seat of CW-1's vehicle and engaged in a brief conversation with CW-1, during which SKERRITT and CW-1 conducted an exchange. After the exchange, SKERRITT walked directly from CW-1's vehicle back to the TARGET VEHICLE – 2 and left the area.  CW-1 then also left the area.

29.     After CW-1 left the vicinity of TARGET LOCATION – 1, law enforcement officers surveilled CW-1 to a predetermined location and retrieved from CW-1 the recorder and transmitter and a clear bag containing a white powdery substance.  Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  During the debriefing, CW-1 told agents that CW-1 met with SKERRITT where he/she purchased the suspected narcotics in exchange for the OAF.

30.     The clear bag contained approximately 55.0 grams of a white powdery substance that field-tested positive for the presumptive presence of fentanyl. Based on my training and experience, as well as that of other agents familiar with this investigation, the white powdery substance appeared to be fentanyl. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.

## III.      The Relevant Technology

31.      I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise than E-911 Phase II data.

32.      The precise location information requested by the proposed warrant will enable investigating agents to determine the TARGET PHONES' location, for the purpose of locating SKERRITT and others involved in his drug distribution operation. The precise location of the TARGET PHONES will also provide law enforcement officers with information about SKERRITT's drug distribution patterns, as well as assist agents in identifying locations and co-conspirators associated with SKERRITT's drug distribution operation. Finally, determining the TARGET PHONES' location also will assist for the purposes of possibly obtaining a warrant to seize and search them, among other investigative avenues.

33.     Historical cell site information will further this investigation in that it can be compared to SKERRITT's prior locations to determine if the TARGET PHONES were at or around the scene of the illegal activity.

34.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

35.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the TARGET PHONES.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

36.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of

business.  This information can include basic personal information about the subscriber, such as

name and address, and the method(s) of payment (such as credit card account number) provided

by the subscriber to pay for wireless telephone service.  I also know that wireless providers such

as T-Mobile typically collect and retain information about their subscribers' use of the wireless

service, such as records about calls or other communications sent or received by a particular

phone and other transactional records, in their normal course of business.  In my training and

experience, this information may constitute evidence of the crimes under investigation.

<strong>AUTHORIZATION REQUEST</strong>

37.     For the reasons listed above, I believe the TARGET PHONES have been, and are

being, utilized by SKERRITT and are located in the District of Massachusetts.  The requested

historical records and precise location information will enable the MBGTF to confirm whether

SKERRITT has been using the TARGET PHONES at relevant times and to identify drug

distribution patterns for SKERRITT. These drug distribution patterns will include areas where

SKERRITT frequents and frequent contacts, both of which will also assist in the MBGTF in

identifying other co-conspirators.

38.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C.

§ 2703(c) and Fed. R. Crim. P. 41.[8]

39.     I also request that the Court direct T-Mobile to furnish the government all

information, facilities, and technical assistance necessary to accomplish the collection of the

information described in Attachment B unobtrusively and with a minimum of interference with

T-Mobile's services, including by initiating a signal to determine the location of the TARGET

---

[8] 18 U.S.C. 2703(c) authorizes a "court of competent jurisdiction" to issue a search warrant for the kinds of records that this application seeks.  A "court of competent jurisdiction" includes a district court ("including a magistrate judge") that has jurisdiction over the offense being investigated.  18 U.S.C. § 2711(3)(A)(i).

PHONES on T-Mobile's network, and at such intervals and times as directed by the government. The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

40.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).  T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.  Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation.  There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual.  See 18 U.S.C. § 2705(b).  Moreover, some of the evidence in this investigation is stored electronically.  If alerted to the existence of the Order, the targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

41.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any required notice until 30 days after the collection authorized by the warrant has been completed.

There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the TARGET PHONES would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

42.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

43.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET PHONES outside of daytime hours.

44.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court, except that the government may provide the search warrant to T-Mobile. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the

investigation.  Accordingly, there is good cause to seal these documents because their premature

disclosure may seriously jeopardize that investigation.


Sworn to under the pains and penalties of perjury,


Jason Taylor
Special Agent, FBI


The affiant appeared before me on this date, by telephonic conference or other reliable electronic
means, pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and
application.


Subscribed and sworn to on
this  3  day of February, 2023.


HON. JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

16

**ATTACHMENT A**

Information about the location of the mobile phone assigned 774-464-1682 (the "TARGET PHONE - 1"), whose service provider is T-Mobile ("T-Mobile"), a wireless telephone service provider that accepts service of process at T-Mobile Security Assistance Team, T-Mobile, T-Mobile 4 Sylvan Way Parsippany, NJ 07054.

Information about the location of the mobile phone assigned 857-588-3057 (the "TARGET PHONE - 3"), whose service provider is T-Mobile ("T-Mobile"), a wireless telephone service provider that accepts service of process at T-Mobile Security Assistance Team, T-Mobile, T-Mobile 4 Sylvan Way Parsippany, NJ 07054.

## ATTACHMENT B

## Particular Things to be Seized

### I.       Information to be Disclosed by the Provider - Precise Location Information

All information about the location of the TARGET PHONES described in Attachment A

for a period of thirty days from the date of service of this warrant, during all times of day and night,

including:

a.   E-911 Phase II data;

b.   GPS data;

c.   latitude-longitude data;

d.   other precise location information; and

e.   data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET PHONE.

This warrant does not authorize the collection of any content of any communications. T-

Mobile ("T-Mobile"), must furnish the government all information, facilities, and technical

assistance necessary to accomplish the collection of the Information about the location of the

TARGET PHONES unobtrusively and with a minimum of interference with T-Mobile's

services, including by initiating a signal to determine the location of the TARGET PHONES on

T-Mobile's network, and at such intervals and times directed by the government.  The

government shall compensate T-Mobile for reasonable expenses incurred in furnishing such

facilities or assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or

to any other person for a period of one year from the date of this Order, or upon notice by the

government within 30 days of the conclusion of its investigation, whichever is earlier, unless the

Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.

**II.      Information to be Disclosed by the Provider - Historical Cell Site Information**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the historical cell site information  associated with the TARGET PHONES listed in Attachment A for **the time period of December 1, 2022 through the date of service of this search warrant**:

    a.  The following information about the customers or subscribers of the telephone call number:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

      viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONES, including:

      i.  Records of user activity for each connection made to or from the TARGET PHONES, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

      ii.  Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

      iii.  All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the TARGET PHONES, to include all <u>voice, SMS, MMS, and data activity</u>; and

      iv.  All records containing round-trip-distance measurements and/or timing advance information for each connection made to or from the Accounts (GSM, CDMA, EVDO, UMTS, LTE, etc.), to include NELOS, RTT, True Call Measurement Data, PCMD records, and Reveal Reports.

## III.    Information to be Seized by the Government

All information described above in Section I and II that constitutes evidence, fruits, or instrumentalities of violations of violation of Title 21 U.S.C. § 841(a)(1), 18 U.S.C. §§ 1956 and 1957 during the period of December 1, 2022 through the date of service of this search warrant, and for the following period of thirty days from the date of service of this warrant, including information relating to the identities of the user of the TARGET PHONES, their respective locations and patterns of activity, and the identities and whereabouts of any co-conspirators.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this Warrant.